# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.

**REPORT &
RECOMMENDATION
DECISION & ORDER**
17-CR-6032-FPG-JWF

JOSEPH W. PEEPLES, III,
           Defendant.

## Preliminary Statement

On February 23, 2017, a Federal Grand Jury in the Western District of New York returned an Indictment charging defendant Joseph W. Peeples, III ("the defendant" or "Peeples") on one count of bank robbery in violation of 18 U.S.C. § 2113(a); one count of entering a bank with intent to commit a larceny in violation of 18 U.S.C. § 2113(a) and one count of bank larceny in violation of 18 U.S.C. § 2113(b). See Docket # 1.

Currently before the Court is the defendant's motion to suppress statements and evidence (see Docket # 14), the government's motion for a competency hearing (see Docket # 28) and the defendant's motion to relocate him (see Docket # 13). For the reasons set forth below, it is my Report and Recommendation that the defendant's motion to suppress (Docket # 14) be **denied.** It is my Decision and Order that the defendant's motion to relocate (Docket # 13) and the government's motion for a competency hearing (Docket # 28) are **denied.**

1

**Relevant Facts**

The Criminal Complaint: According to the affidavit in support of the criminal complaint, on January 5, 2017, at about 8:25 a.m., the Chase Bank located at 1 South Clinton Avenue, Rochester, New York (the "Bank") was robbed. See Docket # 1, at 3. A male suspect, later identified as Peeples, entered the Bank, demanded cash, and absconded with approximately $109,500 in United States currency. Video surveillance from the area outside of the Bank showed Peeples flee the Bank on foot heading north on Stone Street towards East Main Street and enter a taxi in front of the Hyatt Hotel. See id. at 4. No other individuals appear on the video surveillance in the area during this time. Id. The taxi driver indicated to the police that he dropped off Peeples at the Trailways Bus Station (the "Bus Station") and that Peeples left sunglasses and a jacket with bundles of cash totaling approximately $9,990 inside the taxi. Id. Video surveillance from the Bus Station showed the taxi dropping off the defendant, who then entered the Bus Station with a bag. Inside the Bus Station, the surveillance showed Peeples enter a bathroom, exit the bathroom in different clothes several minutes later and then proceed out of the Bus Station into another taxi. Id. at 5. Upon further investigation, the police found $43,500 in the trash can inside the Bus Station bathroom. Id.

The police interviewed the taxi driver who told them that he drove the defendant to a Quality Inn and then picked him up an hour later. The taxi driver stated that he dropped Peeples off at the Bus Station at approximately 10:05 a.m. Id. Video surveillance from inside the Qualify Inn showed the defendant enter the hotel in the same clothes he had on when he left the Bus Station. Law enforcement interviewed the manager of the Quality Inn who said that Peeples provided his name, address and driver's license number when he rented the room. Id. at 6. The taxi driver reviewed the surveillance video and confirmed that Peeples was the individual he transported in his taxi. Id. at 5.

Video footage showed Peeples enter the Bus Station again at 10:14 a.m. and purchase a bus ticket to New York City. The bus left Rochester at 10:55 a.m. and made several stops. Id. Law enforcement learned that the defendant exited the bus in Binghamton, New York. Video surveillance confirmed that the defendant got off the bus in Binghamton and got into a taxi. Id. Law enforcement identified the driver of the taxi and interviewed him. The driver told law enforcement that he took Peeples to four or five different hotels, none of which would accept cash without a credit card. Id. Eventually, the driver dropped Peeples off at the Grand Royale Hotel in Binghamton.

The Hearing Evidence: An evidentiary hearing in this matter was held on July 12, 2017. FBI Special Agent John Bokal, Jr.

3

("Agent Bokal") testified that on January 5, 2017, an agent in Rochester informed him that Joseph Peeples had robbed a bank in Rochester and that he had fled and disembarked a bus in Binghamton. Hearing Transcript, July 12, 2017, Docket # 33 ("Tr."), at 13. Agent Bokal testified that the FBI had tracked Peeples's movements in and around Rochester and then to Binghamton and the Grand Royale Hotel. Id. at 14. Based on this information, Agent Bokal believed he had probable cause to locate and arrest the defendant. Id.

Agent Bokal contacted an investigator with the Binghamton Police Department who reviewed video surveillance from the Binghamton Bus Station and confirmed that the he believed the suspect entered a taxi. Id. at 15. Through these contacts, Agent Bokal learned that Peeples had been taken to the Grand Royale Hotel. Id. Agent Bokal arrived at the State Street entrance to the Grand Royale Hotel at around 9 p.m. on January 5. Id. at 16. Agent Bokal proceeded through a set of unlocked doors into a "foyer," where he encountered a set of locked doors. Id. A sign to the side of the locked doors provided a phone number to call for assistance. Id. Agent Bokal called the number and identified himself as an FBI agent to the hotel manager Salim Khan. Id. at 19. Several minutes later, Mr. Khan appeared and opened the locked door for Agent Bokal. Id. at 19-20.

Mr. Khan confirmed that a black male with a white shirt had been dropped off in a taxi earlier that night. Id. at 20. Agent

Bokal showed Mr. Khan a picture of the defendant, and Mr. Khan confirmed that Peeples was the individual who had been dropped off earlier. Id. Mr. Khan retrieved a copy of the bill that bore the defendant's name and a copy of his identification. Id. Mr. Khan informed Agent Bokal that Peeples had paid in advance for four nights. Id. at 39. Agent Bokal confirmed that Peeples was the person who had checked into the hotel.

Standing in the lobby of the hotel, just inside the locked doors, Agent Bokal asked Mr. Khan if Peeples was currently inside the hotel. Mr. Khan responded that the defendant had asked for the names of "strip bars" in Binghamton and had left shortly thereafter in a taxi. Id. at 20-21. Agent Bokal then contacted the state police to set up surveillance at one strip club, Madame Oar's, and contacted agents in Rochester to update them on the progress of the investigation. Id. at 21. Agent Bokal then requested that Mr. Khan show Agent Bokal to the defendant's room. Id. Mr. Khan led Agent Bokal and three members of the Binghamton Police Department from the lobby up a set of stairs, through a bar area and then through an unlocked doorway which led to another set of stairs; these stairs led from the second floor to a landing and then to the third floor of the hotel. Id. at 21-22. As they were making their way up the staircase to the third floor, Mr. Khan pointed to an individual on a landing on the stairway and said, "that's him." Id. at 22. Peeples was sitting on the stairs with

a cellphone when Agent Bokal approached and arrested him. Id. at 28.

Agent Bokal did not pass through any locked doors once he entered the hotel. Id. at 27-28. He testified that anyone in the hotel would have had access to the stairwell where he found the defendant. Id. at 32-35. On cross-examination, Agent Bokal testified that he had considered obtaining a warrant for the defendant's arrest, but while he was attempting to establish surveillance and determine the layout of the hotel, he encountered Peeples on the stairs, obviating the need for a warrant. Id. at 40.

Law enforcement interviewed Peeples after his arrest. The following day, January 6, 2017, they transported Peeples to Rochester, New York for his initial appearance. Prior to the initial appearance, FBI Special Agent Seth Fleitman obtained a criminal complaint and arrest warrant. See Docket # 1, 4. The arrest warrant was returned at 3:29 p.m. on January 6, 2017. According to the audio recording, the defendant's initial appearance began before the undersigned at 3:50 p.m. on January 6, 2017. The federal public defender was appointed to represent the defendant.

## Procedural History

On February 13, 2016 the defendant requested the Court schedule a preliminary examination. The hearing did not occur

because on February 23, 2017 the federal grand jury indicted Peeples on bank robbery charges. The defendant was arraigned on February 28, 2017. During his arraignment, the defendant asked to discharge his public defender and represent himself. <u>See</u> Docket # 10. After conducting a detailed inquiry into Peeples's understanding of the disadvantages of representing himself, the Court terminated the defendant's court-appointed attorney, Mark Hosken, and allowed Peeples to represent himself. <u>See id.</u> On March 16, 2017, the defendant filed a motion to direct the Marshal to transfer him to a jail closer to the Court. <u>See</u> Docket # 13.

Peeples filed a <u>pro se</u> motion to suppress evidence on March 30, 2017. <u>See</u> Docket # 14. The government responded to the defendant's motion on April 28, 2017, <u>see</u> Docket # 16, and the Court held an oral argument on May 5, 2017. During this appearance the defendant requested and the Court granted Peeples's request to appoint Assistant Federal Public Defender Mark Hosken as stand-by counsel. <u>See</u> Docket # 17. The Court reserved decision on the motion to suppress and requested that the parties submit additional briefing regarding law enforcement's entry into the defendant's room. The government filed a supplemental affidavit regarding entry into the defendant's hotel room on June 6, 2017. <u>See</u> Docket # 18.

The Court held an evidentiary hearing on July 12, 2017, regarding the defendant's arrest and his expectation of privacy

where he was arrested.  See Docket # 20.  One government witness testified at the hearing.  The evidentiary hearing raised a number of additional issues, and the Court sought briefing on those topics after the filing of the hearing transcripts.  See Docket # 24.  On September 13, 2017, the government notified the Court that it would not use Peeples's post-arrest statements made to law enforcement at the Binghamton Police Department on January 5, 2017 in their case-in-chief.

On August 18, 2017, while the hearing transcripts were being prepared, the government filed a motion to evaluate Peeples's competency to stand trial.  See Docket # 28.  By responsive papers filed August 23, 2017, Peeples opposed the government's motion.  Docket # 29.

In early September, the transcripts of the evidentiary hearing were filed.  Thereafter, the defendant and the government submitted post-hearing briefs on September 15, 2017.  See Docket ## 38, 39.  The defendant's post-hearing brief, which was not due until September 29, 2017, raised a number of issues for the first time.  To allow the defendant an opportunity to respond to the government's arguments and to allow the government an opportunity to respond to the defendant's new arguments, the Court allowed the parties to file additional and final post-hearing briefs by October 4, 2017.  See Docket # 40.  Peeples filed his brief on October 2, 2017, and the government filed their brief on October 4, 2017.

<u>See</u> Docket # 42, 43.  The motion for suppression and the motion for a competency hearing are now fully briefed.

## **Discussion**

I. <u>Warrantless Arrest</u>:  "[A]lthough a warrant presumptively is required for a felony arrest in a suspect's home, the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." <u>Florida v. White</u>, 526 U.S. 559, 565-66 (1999); <u>see</u> <u>Steagald v. United States</u>, 451 U.S. 204, 221 (1981) ("[I]f probable cause exists, no warrant is required to apprehend a suspected felon in a public place.").  The defendant contends that evidence seized from his room at the Grand Royale Hotel after his warrantless arrest must be suppressed because (1) law enforcement did not have probable cause to arrest him and (2) he was not arrested in a public place.  Addressing each prong of the defendant's argument separately, I conclude that his warrantless arrest was based on probable cause and occurred in a public place.

<u>Probable Cause</u>:  Peeples's argument that law enforcement lacked probable cause to arrest him is without merit.  Probable cause to arrest exists if police "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being

committed (2) by the person to be arrested." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983). The "facts and circumstances" supporting an officer's inference of probable cause need not reach "the level of evidence necessary to support a conviction," but they must be "more than rumor, suspicion, or even a 'strong reason to suspect.'" Id. at 375 (quoting Henry v. United States, 361 U.S. 98, 102 (1959)). In addition, "'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) (quoting Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1983)). Evidence that would be inadmissible at trial may be relied on to support a finding of probable cause. Stansbury v. Wertman, 721 F.3d 84, 91 (2d Cir. 2013).

"When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original) (internal quotation and citation omitted). Moreover, a law enforcement officer "may draw inferences based on his own experience in deciding whether probable cause exists." Ornelas v. United States, 517 U.S. 690, 700 (1996). Indeed, it is of "'no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation."

Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989) (quoting United States v. Manley, 632 F.2d 978, 984 (2d Cir. 1980)).  The Supreme Court has made clear that there is no litmus test for probable cause.  The Court must examine the "totality of the circumstances" and remain cognizant that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 233 (1983).

The totality of the circumstances here establish that law enforcement had ample probable cause to arrest Peeples for the Rochester bank robbery.  The video surveillance from outside the Bank showed an individual flee on foot heading north on Stone Street towards East Main Street and enter a taxi in front of the Hyatt Hotel.  Docket # 1, at 4.  No other individuals appear on video surveillance in the area during this time.  Id.  The taxi driver indicated to the police that he dropped off a person he later identified as Peeples at the Bus Station, and that Peeples left bundles of cash totaling approximately $9,990 inside the taxi. Id.  Video surveillance from the Bus Station showed Peeples enter the Bus Station bathroom with a bag and later emerge from the Bus Station and proceed into another taxi.  Id. at 5.  The police found $43,500 in the trash can inside the Bus Station restroom.  Id.

The taxi driver drove the defendant to a Quality Inn and then picked him up an hour later, at around 10:05 a.m.  Video

11

surveillance from the Quality Inn showed the defendant enter the hotel in the same clothes he was wearing when he left the Bus Station. The manager of the Quality Inn confirmed that, upon renting the room, Peeples provided his name, address and driver's license number.

Video footage shows Peeples enter the Bus Station at 10:14 a.m. and purchase a bus ticket to New York City. The bus left Rochester at 10:55 a.m. and made several stops. Id. at 5. Law enforcement learned that the defendant exited the bus in Binghamton, New York. Video surveillance confirmed that the defendant got off the bus in Binghamton and got into a taxi. Id. Law enforcement identified the driver of the taxi and interviewed him. The driver told law enforcement that he took Peeples to four or five different hotels, none of which would accept cash without a credit card. Id. at 6. Eventually, the driver dropped Peeples off at the Grand Royale Hotel in Binghamton.

Upon arriving at the Grand Royale Hotel, Agent Bokal confirmed with Mr. Khan that a black male with a white shirt had been dropped off in a taxi earlier that night. Tr. at 20. Agent Bokal showed Mr. Khan a picture of the defendant, and Mr. Khan confirmed that Peeples was the individual who had been dropped off earlier. Id. Mr. Khan retrieved a copy of the bill that bore the defendant's name, and a copy of his identification. Id. Mr. Khan informed

Agent Bokal that Peeples had paid in advance for four days.  Id.
at 39.

The foregoing contradicts the defendant's assertions that the
investigations "did not in no way [sic] tie defendant to bank or
bank money" and that the "defendant had not been positively
identified by anyone."  Def.'s Mot., Docket # 14, at 7.  Instead,
given the totality of the circumstances here, I find that law
enforcement had probable cause to arrest Peeples.

The police and FBI, working together and sharing information
with one another, were able to identify Peeples and track and
verify his actions in an unbroken chain of events from the Bank,
to the Bus Station, to a hotel, back to the Bus Station and then
to the hotel in Binghamton, where he was found.  Peeples also left
a trail of large quantities of cash in several locations, and
provided his name and contact information to the two hotels in
which he rented rooms, further confirming that the person law
enforcement were tracking was in fact Peeples and that Peeples had
robbed the Bank.  Coupled with video surveillance in which he is
clearly visible, law enforcement easily identified Peeples and
connected him to the bank robbery in Rochester.  Cf. Savino, 331
F.3d at 74  ("The collective knowledge doctrine provides that, for
the purpose of determining whether an arresting officer had
probable cause to arrest, 'where law enforcement authorities are
cooperating in an investigation, . . . the knowledge of one is

presumed shared by all.') (quoting <u>Andreas</u>, 331 F.3d at n.5); <u>United States v. Herron</u>, 18 F. Supp. 3d 214, 228 (E.D.N.Y. 2014) ("The collective knowledge doctrine allows for the imputation of knowledge between officers when one officer, having acquired probable cause, instructs another officer to conduct a search or arrest, even if the latter is far less informed.").

<u>Public Place:</u>  Having established that the defendant's arrest was based on probable cause to suspect that he committed the bank robbery, I turn to whether the warrantless arrest was made in a public place.

Police need not obtain a warrant to effectuate an arrest in a public place.  <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 423 (1976) (noting that "the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause").  Whether the arrest was made an in a public place turns on whether the defendant had an expectation of privacy in the place in which he was arrested.  <u>See</u> <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976) (explaining that a public place is one in which the defendant does not have an expectation of privacy).  Thus, the threshold question here is whether Peeples had a legitimate expectation of privacy in the area in which he was arrested – on the stairwell landing inside the Grand Royale Hotel.  Peeples contends that because the Grand Royale Hotel was a locked "private dwelling," it was a "secured area of privacy" entitling

14

him to a reasonable expectation of privacy.  See Docket # 14, at 5.  I disagree.

It is well-established that the common areas of multi-tenant buildings, even if behind locked doors, are not within a tenant's zone of privacy.  United States v. Holland, 755 F.2d 253, 255-56 (1985) (collecting cases); see United States v. Gray, 283 Fed. App'x 871, 873 (2d Cir. 2008) (holding that defendant "did not have a privacy interest in the hallway [of his apartment building] because it was not subject to his exclusive control"); United States v. Shaw, 269 F. Supp. 2d 90, 91 (2d Cir. 2003) ("It is well-settled that individual tenants in multifamily dwellings have no legitimate privacy expectation in common areas, . . . even when guarded by doors.").  Common areas of hotels are entitled to an even further diminished expectation of privacy where, as here, such common areas are regularly exposed and accessible to others.[1] See United States v. Mankani, 738 F.2d 538, 544 (2d Cir. 1984) (recognizing that the "transitory nature" of hotels "diminishes a person's justifiable expectation of privacy in them").  Indeed, in United States v. Roby, 122 F.3d 1120, 1125 (8th Cir. 1997), the Eighth Circuit concluded that there is no reasonable expectation of privacy in a corridor outside of a hotel room.

---

[1] Peeples mistakenly relies on a line of cases establishing an expectation of privacy in private hotel rooms.  The defendant does not dispute that he was not arrested inside his locked hotel room.

15

The testimony adduced at the evidentiary hearing makes clear that Peeples did not have a reasonable expectation of privacy on the stairs inside the Grand Royale Hotel. That area, like the area described by the Eighth Circuit in Roby, was open to anyone who, like Agent Bokal, gained legal access to the inside of the hotel. Upon arriving at the Grand Royale Hotel, Agent Bokal proceeded through a set of unlocked doors into a "foyer," where he encountered a set of locked doors. Tr. at 18. A sign to the side of the locked doors provided the name and phone number of the manager, Mr. Khan. Id. Agent Bokal called Mr. Khan, and identified himself as an FBI agent. Id. at 19. Several minutes later, Mr. Khan appeared and let in Agent Bokal. Id. at 19-20. Mr. Khan led Agent Bokal and three members of the Binghamton Police Department from the lobby up a set of stairs, through a bar area, and then through an unlocked doorway which led to another set of stairs; these stairs led from the second floor to a landing and then to the third floor of the hotel. Id. at 21-22. As they were making their way up the staircase to the third floor, Mr. Khan identified Peeples  sitting on the stairway. Id. at 22. After he entered the hotel, Agent Bokal did not pass through any locked doors (id. at 27-28), and no special keys or permissions were required to gain access to the stairwell. Anyone inside the hotel would have had access to the stairwell where Agent Bokal found and arrested the defendant. Id. at 32-35.

That the front door of the Grand Royale Hotel was locked does not change this analysis.[2]  Although Peeples subjectively believed that the locked door prevented him from being apprehended inside the hotel, <u>anyone</u> could be let in by Mr. Khan.  That Peeples did not have control over who entered or exited the building militates <u>against</u> a finding of a reasonable expectation of privacy, not for it.  Because I conclude that the defendant was arrested in a public place based on probable cause, it is my Report and Recommendation that his motion to suppress evidence obtained as a result of the arrest be **denied.**

II. The Defendant's Statements:  In his moving papers, Peeples seeks suppression of his post-arrest statements to law enforcement for alleged violations of his Fourth Amendment rights.  <u>See</u> Docket # 14, at 1, 11-14.  On September 13, 2017, the government notified the Court that it would not use the defendant's post-arrest statements to law enforcement in its case-in-chief.  <u>See</u> Docket # 37.  As a result, Peeples's motion to suppress statements is **denied as moot.**

III. Alleged Violations of Federal Rules of Criminal Procedure:  The defendant also argues that there were various violations of the Federal Rules of Criminal Procedure ("Rule")

---

[2] The relevant inquiry is not whether Agent Bokal was legally inside the hotel – although based on the consent of Mr. Khan, he was – but rather whether <u>Peeples</u> had an expectation of privacy in the common areas of the hotel.

which require dismissal or suppression.[3]    After careful consideration, I find that none of the defendant's arguments have merit.  See Docket # 21, at 3; Docket # 23, at 3-6; Docket # 39, at 5-14.

Initial Appearance:  Peeples argues that he was transferred out of the Northern District of New York for his initial appearance the day after his arrest in violation Rule 5.[4]  Rule 5 provides that, after an arrest, a defendant must appear before a magistrate judge "without unnecessary delay." Fed. R. Crim. P. 5(a)(1)(A). When the arrest occurs outside the district where the offense allegedly occurred, as here, the initial appearance must be in the district of arrest or in an "adjacent district if: (i) the appearance can occur more promptly there; or (ii) the offense was allegedly committed there and the initial appearance will occur on the day of arrest." Fed. R. Crim. P. 5(c)(2).  The defendant bears the burden of proof to establish a violation of Rule 5.  See United States v. Walker, 176 F.2d 564 (2d Cir. 1949), cert. denied 338 U.S. 891.

Peeples was arrested in Binghamton, in the Northern District of New York, on January 5, 2017, at around 9 p.m.  The following

---

[3] To the extent Peeples raises other arguments in support of his motion to suppress that are not addressed here, the Court concludes that they do not have merit.
[4] Peeples's citation to Fed. R. Crim. P. 5.1 is misplaced.  That rule addresses preliminary hearings, not initial appearances.  A preliminary hearing, if requested, must occur within 14 days of the initial appearance.

day, he was transferred to Rochester, in the adjacent Western District of New York, where the offense allegedly occurred. The defendant appeared before the undersigned at 3:50 p.m. on January 6, 2017, for his initial appearance. Peeples failed to meet his burden of proving that this sequence of events – culminating in his initial appearance 19 hours after his arrest – constituted "unnecessary delay." Nor has Peeples established that he would have received a more prompt initial appearance in the Northern District of New York (in either Binghamton or Syracuse) than he did in the Western District of New York (in Rochester).

Even assuming there was a violation of Rule 5, the remedy is suppression of any prejudicial evidence obtained as a result of the violation, not dismissal, as the defendant contends. See United States v. Perez-Torribio, 987 F. Supp. 245 (S.D.N.Y. 1997); United States v. DiGregorio, 795 F. Supp. 630 (S.D.N.Y. 1992). The only evidence that could arguably be considered obtained "as a result of" any alleged Rule 5 violation is the defendant's post-arrest statements to law enforcement, and the government indicated that it will not use that post-arrest statement in its case-in-chief. Therefore, even if there were a Rule 5 violation, there is nothing to suppress.

Allegedly Unsworn Criminal Complaint: Peeples claims that the Court's oversight in signing the affidavit in support of the criminal complaint requires suppression or dismissal of the

complaint.  Because the defendant was arrested without a warrant on January 5, 2017, the government sought and obtained a criminal complaint prior to the defendant's initial appearance on January 6, 2017.  The criminal complaint was signed by FBI Special Agent Seth Fleitman.  The undersigned also signed the criminal complaint, indicating that it was sworn to before me and signed in my presence.  The complaint consisted a cover page, to be signed by both the judge and the affiant and incorporated an attached supporting affidavit.  In the supporting affidavit, Agent Fleitman described the probable cause for the defendant's arrest and explained the factual and legal basis for the Court to sign the criminal complaint.  The affidavit was signed by Special Agent Fleitman, but was inadvertently not signed by the Court.

Contrary to the defendant's assertion, the Court's mistake in not signing the jurat on the affidavit in support of the criminal complaint does not render the criminal complaint itself void.  Rule 3 requires that the complaint "be made under oath before a magistrate judge."  It does not specifically require that the Court sign the affidavit.  Here, the complaint was signed by the Court but the affidavit was only signed by the agent.  In any event, "minor errors in an affidavit are not cause for invalidating the warrant it supports."  United States v. Waker, 534 F.3d 168, 171-72 (2d Cir. 2008).  Here, my signature on the criminal complaint, which references the affidavit, is sufficient to confirm that

Special Agent Fleitman appeared before me and then signed and swore to the truth of the affidavit in my presence.

Arrest Warrant:  The defendant alleges that that the search warrant executed and returned on January 6, 2017 is defective and "fraudulent" because he was in fact arrested on January 5 and because the warrant was returned before the initial appearance.[5] It is undisputed that Peeples was arrested, without a warrant, on January 5.  However, Rule 5(b) requires that "[i]f a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed."  Thus, law enforcement were simply following proper procedure by seeking and obtaining an arrest warrant and complaint for Peeples after his probable cause warrantless arrest.  Although Peeples was already in custody at the time, the warrant "return" simply reflects that Peeples was arrested pursuant to this warrant on January 6.

Peeples's argument that the initial hearing occurred before the warrant was returned (see Docket # 21, at 3) is also without merit.  An arrest warrant is not required for an initial appearance.  In any event, the time stamp on the arrest warrant indicates that it was returned on January 6, 2017, at 3:29 p.m.

---

[5] Peeples also claims that there was no signature on the arrest warrant.  This assertion is belied by the actual arrest warrant, on which my signature clearly appears. The FBI agent's name appears below my signature.  See Docket # 4.

<u>See</u> Docket # 4. According to the electronic recording, the initial appearance commenced twenty minutes <u>later</u>, at 3:50 p.m.[6]

    <u>IV. Decision and Order on Competency Hearing and Psychiatric Evaluation</u>: The government has moved pursuant to 18 U.S.C. § 4241(a) for a hearing to determine the competency of the defendant and for a psychiatric evaluation of the defendant pursuant to § 4241(b). The basis for the motion is government counsel's observation of the defendant during court proceedings, statements made to the FBI and a review of the defendant's mental history from previous criminal prosecutions. <u>See</u> Docket # 28, at 2. Specifically, the government contends that the defendant was found incompetent to stand trial in a bank robbery case in the District of Colorado in June 2011, but was later restored to competency. The government also alleges the defendant's competency was "at issue" in another bank robbery case in the Northern District of Ohio in April 2013. <u>Id.</u> The defendant submits he is fully competent to stand trial and opposes any hearing or competency evaluation. <u>See</u> Docket # 29. In opposing the government's motion, the defendant submitted a copy of a June 23, 2013 Competency Evaluation conducted by mental health experts at the Federal Bureau

---

[6] Peeples is concerned that the transcript of his initial appearance does not bear a time stamp. <u>See</u> Docket # 36, at 2; Docket # 39, at 8. As is common for pre-trial proceedings, no court reporter was present for the defendant's initial appearance. Instead, the proceeding was electronically recorded. The court reporter later transcribed this electronic audio recording into the written transcripts. As a result, the transcripts do not bear a time stamp because they were not transcribed <u>during</u> the hearing, but rather at a later date.

of Prisons in which he was found competent to stand trial for 2005 bank robbery occurring in Ohio.

A court shall hold a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense." 18 U.S.C. § 4241(a) (emphasis added); see United States v. Marshall, 458 F.2d 446, 450 (2d Cir. 1972).

Although I am concerned about the government's allegations about the defendant's competency, their brief submission does not provide a sufficient basis for a competency evaluation to be ordered. To be sure, Peeples has a history of mental health issues and has been previously evaluated. In 2011, he was found incompetent but was restored to competency and was able to plead guilty to bank robbery in 2012. And in 2013, he was evaluated again and found not to suffer from a major mental illness. Indeed, in the 2013 evaluation, the evaluators opined that Peeples may be feigning mental illness and questioned the accuracy of the earlier evaluation finding the defendant incompetent due to schizophrenia. See Exhibit "1" annexed to Docket # 29, at 4-8. Based on the evidence currently in the record, there is no reason to believe that the defendant is presently suffering from an impairment which would render him incompetent to stand trial. The Court has

23

observed the defendant's behavior in open court and has reviewed his filings with the Court.  There is nothing that I have observed or read that would suggest that the defendant does not understand the charges against him or the consequences of the proceedings. Accordingly, there is no "reasonable cause" to believe that the defendant is currently incompetent.  Having found that there is no reasonable cause for a hearing, it follows that there is no need for a psychiatric examination and report.  The government's motion for a competency hearing and psychiatric evaluation (Docket # 28) is therefore **denied without prejudice.**  Should the government have additional information supporting the need for a competency evaluation or should the Court, the government or stand-by counsel observe any behavior indicating major mental illness, the Court will not hesitate to revisit the issue of competency.

V. Decision and Order on Motion to Relocate:  In March, the defendant filed a motion seeking to be incarcerated at a location closer to this Court.  See Docket # 13.  Since that time the defendant has made several appearances in court without incident. Generally speaking, the decision as to where a federal defendant is housed pending trial is at the direction of the Marshal, based on the availability of space in various facilities as well as the background and security risk the defendant presents.  At this time I see no reason to direct the Marshal to move the defendant to a

particular facility. Accordingly, the defendant's motion to transfer jails is **denied without prejudice**.

**Conclusion**

For the foregoing reasons, it is my Report and Recommendation that the defendant's motion to suppress (Docket # 14) be **denied.** It is my Decision and Order that the government's motion for a competency hearing (Docket # 28) is **denied without prejudice** and that the defendant's motion to relocate (Docket # 13) is **denied without prejudice.**

   /s/ Jonathan W. Feldman   
Jonathan W. Feldman
United States Magistrate Judge

Dated:    December 4, 2017
           Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., <u>Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

              /s/ Jonathan W. Feldman
                Jonathan W. Feldman
             United States Magistrate Judge

Dated:     December 4, 2017
           Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1103 (1992); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).